## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Karen Sue Merdan,                                   **Case No.: 10-CV-2376 MJD/SER**

       Plaintiff,

v.                                                  **REPORT AND RECOMMENDATION**

Michael J. Astrue,

       Defendant.

---

    James H. Greeman, Esq., Greeman Toomey, PLLC, 250 Marquette Avenue, Suite 1380, Minneapolis, Minnesota 55401, on behalf of Plaintiff.

    Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South 4th Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

    Pursuant to 42 U.S.C. § 405(g), Plaintiff Karen Sue Merdan ("Merdan") seeks judicial review of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), who denied Merdan's application for supplemental security income.  This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.  The parties filed cross-motions for summary judgment.  For the reasons set forth below, this Court recommends that Merdan's motion be denied and that the Commissioner's motion be granted.

    I.      **BACKGROUND**

        **A. Procedural History**

    Merdan filed an application for supplemental security income (SSI)  and social security disability income (SSDI) on August 27, 2007, alleging a disability beginning March 1, 2005, due

to diabetes mellitus (type II), obesity, hypertension, fatigue, asthma, dizziness, neck pain, lumbago, impetigo, anxiety disorder, and depression.  (Admin. R. at 101-114, 337, 359, 525, 527, 530).   Merdan asserts that these impairments prevented her from obtaining gainful employment.

The application was denied initially on October 30, 2008 and was denied for reconsideration on February 28, 2008.  *Id.* at 4.  Merdan requested a hearing.  Administrative Law Judge Diane Townsend-Anderson ("the ALJ") heard the matter on January 22, 2009.  *Id.* at 13-38.  At Merdan's request, the ALJ held the record open for an additional twenty days to allow Merdan to submit additional evidence supporting her alleged depression and anxiety.  *Id.* at 37. The ALJ issued an unfavorable decision on May 7, 2009.  *Id.* at 4-10.  On May 5, 2009[1], Merdan sought Appeals Council review of the ALJ's decision, but the Appeals Council denied her request for review.  *Id.* at 11-12, 650-53.  The ALJ's decision, therefore, became final.  *See* 42 U.S.C. § 405(g); *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir. 1992).  Merdan now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### B.  Plaintiff's Testimony

Merdan completed three years of college but did not obtain her Bachelors or Associates degree.  *Id.* at 17.  She does not have any additional vocational training and left her most recent job so that she could move from Wisconsin to Minnesota to assist her disabled daughter.  *Id.* at 18.  Merdan was unable to obtain employment upon moving to Minnesota, and, at the time of the hearing, was living off the $24,000 proceeds from the sale of her home in Wisconsin.  *Id.* at 18, 25-26.  She has four grandchildren whom she sees intermittently.  *Id.* at 19.  Merdan did not have

---

[1] The date of May 5, 2009 printed on Merdan's Request for Review of Hearing Decision/Order form appears to be inaccurate given that the ALJ's decision was issued two days later on May 7, 2009.  *Id.* at 1, 10-11.

medical insurance and paid for her medical care out-of-pocket.  *Id.* at 26.

Merdan tried to regulate her diabetes through her diet and medications, but she characterized her diabetes as "still uncontrolled."  *Id.* at 18.  Her daily routine involved watching television and taking care of household tasks.  *Id.* at 18.  On average, Merdan took two naps per day due to her chronic fatigue.  *Id.* at 19.  She did not drive due to concerns about bad weather and had her groceries delivered because of the exhaustion she experienced in getting to and from the bus stop.  *Id.* at 18-19.  Merdan typically spent two to three hours per day on the computer looking for work and playing games and playing piano nearly every day for an hour.  *Id.* at 20.  She did not engage in any activities outside her home.  *Id.*  Merdan asserted that she was unable to work a full-time job because she often required extra sleep, struggled to muster the energy to perform daily household tasks, and relied exclusively on public transportation.  *Id.*

Merdan testified that she was diagnosed with diabetes sometime between 2000 and 2004.  *Id.* at 20.  She tested her blood sugar only once daily either before breakfast, at dinnertime, or several hours after dinner; she did not test her blood sugar three times per day every day because she lacked the medical coverage necessary to obtain adequate testing resources.  *Id.* at 20-21.  In 2009, Merdan's blood sugar ranged from a high of 189 to a low of 114.  *Id.* at 21.  Merdan's diabetes symptoms included shakiness, voracious appetite, and dizziness.  *Id.*  She did not exercise because cold weather left her feeling breathless.  *Id.* at 22.

Merdan also reported experiencing bodily pain.  *Id.* at 22.  She recalled one recent incident of pain in her lower back radiating down to her legs causing numbness after carrying a backpack and two bags of groceries home from the store.  *Id.*  Such incidents left her feeling frustrated.  *Id.*  Though she had not yet told her doctor of this recent incident, she speculated that her doctor would have prescribed an increased dose of the blood sugar controlling diabetes drug,

Metformin.  *Id*.  Merdan's pain triggers included carrying a backpack and heavy objects.  *Id.* at 23.

With respect to her anxiety and depression, Merdan stated, "I think it's more of a frustration that I just can't do what I used to do."  *Id.* at 23.  Merdan reported needing to sleep often and feeling listless.  *Id*.  She reported  never experiencing mental or emotional difficulties.  *Id*.  Merdan asserted that Dr. David Vagneur,[2] her primary care physician, considered prescribing her medication for her depression but that she was "leary" of taking any additional medications for fear of an adverse reaction with her other prescriptions.  *Id.* at 24.  Merdan's diabetic educator, Pat Kowalski, also suggested that Merdan was depressed.  *Id.* at 25.

As of the date of the hearing, Merdan, who was five feet, three inches in height, weighed 190 pounds.  *Id.* at 23.  She successfully lost twelve pounds in the previous year by watching her diet.  *Id*.  Merdan reported wanting to feel stronger and going to physical therapy to help with her fatigue.  *Id*.  Occasionally, Merdan experienced headaches and numbness on the left side of her body and face as side effects of her medications.  *Id.* at 24.  She also had difficulty reading a computer screen without magnification.  *Id.* at 25.  Merdan reported the limitations Dr. Vagneur described in his physical RFC assessment relating to the numbness and tingling on her left side that prevented her from feeling, fingering, pulling, or pushing with her left hand.  *Id*.  She reported using her left arm to carry groceries out of necessity.  *Id*.

Merdan included working as a reservation clerk at a hotel and as a check depositor (operations processor II) in her work history.  *Id.* at 27-28.  Merdan stated that her reservation clerk position involved both sitting and standing for approximately four hours on her feet

---

[2] Based on the medical evidence in the Administrative Record, the Court has determined that the transcript from the hearing before the ALJ in error refers to Dr. Vagneur as "Dr. Vodner."  *Id.* at 25.

standing and walking and four hours per day keyboarding and computing.  *Id.* at 32.  Her check depositor position was primarily sedentary, yet she would periodically stand up and move because her legs would swell.  *Id.*  Merdan also stated that she worked part-time as an American Legion waitress in 1995.  *Id.* at 26.

### C.  Medical Evidence

Merdan does not object to or contest the ALJ's findings regarding her physical impairments: type II diabetes mellitus, obesity, hypertension, and asthma.  Rather, Merdan contends that the ALJ failed to fully develop the record solely with respect to her mental impairments of depression and anxiety.  Thus, for the purposes of evaluating whether the ALJ's decision not to order a psychological consultative examination of Merdan and the Appeals Council's non-consideration of Dr. Karayusuf's November 4, 2009, mental health evaluation were based on substantial evidence on the record as a whole, the Court will extensively analyze only the relevant portions of the medical evidence relating directly to Merdan's alleged depression and anxiety.

Osteopathic physician, Dr. Danielle R. Busse-Quenan, saw Merdan on March 22, 2007, where Busse-Quenan described Merdan as "a little depressed but ok."  *Id.* at 299, 414.  Merdan did not appear to be in acute distress.  *Id.*  She listed Merdan's neurological mental status as normal.  *Id.* at 300.  Dr. Busse-Quenan did not schedule any follow-up or prescribe any depression or anxiety medications.  *Id.* at 299-300, 414-15.

In an interview with disability examiner J. Robinette[3] on September 19, 2007, Merdan stated that depression was one of the conditions that limited her ability to work.  *Id.* at 130.  Merdan asserted that the onset date of her disability was March 24, 2007.  *Id.*  In the interview,

---

[3] The record did not contain J. Robinette's first name or title.  *Id.* at 130.

Merdan stated that one of the psychologists Dr. Vagneur referred her to thought that Merdan was suicidal. Id. at 133.  Merdan, nonetheless, stated that she never "felt that way." *Id.*

October 1, 2007, November 16, 2007, and February 12, 2008, Margo Collins and Michelle Leahy, Disability Specialists with the Wisconsin Department of Health and Family Services sent records requests to Merdan's various medical providers. *Id*. at 315, 322, 326, 330, 371-72, 393-94, 440-41.  All of these requests listed depression as one of Merdan's alleged impairments. *Id.* at 315, 322, 326, 371, 393-94.

In a Case Development Worksheet with a referral date of October 1, 2007, Merdan alleged depression. *Id.* at 386-91.  In an entry dated November 14, 2007, Margo Collins wrote, "We are going to need a detailed physical exam and also a mental status for her depression." *Id.* at 386.  In a November 20, 2007 entry, Collins noted that she received Merdan's telephone message that she would not be able to attend an appointment[4] that "had been scheduled because you indicated on your application that you had depression." *Id*. at 390.  Collins also reported stating to Merdan: "[if] you feel the depression is not a disabling condition, please call me and indicate this.  Otherwise, if you refuse to attend this examination we will be forced to deny your claim for failure to cooperate." *Id.*

On October 9, 2007, Merdan completed a Social Security Administration Adult Function Report. *Id.* at 142-150.  In response to a question regarding conditions that affect her sleep, Merdan stated, "I am depressed and sometimes I sleep whole days at a time." *Id.* at 143.  Merdan also reported not adequately caring for her hygiene and appearance because she had a diminished level of concern for her appearance and sometimes did not get dressed at all. *Id*.  She further stated that she was less enthusiastic about making meals and that she had "to psyche

---

[4] Based on an entry dated December 4, 2007, written by Margo Collins, the appointment the Department scheduled was with Dr. Eric Carlson. *Id.* at 391.

[herself] into doing anything." *Id.* at 144. Merdan spent much of her days watching television and playing piano and repeatedly expressed feeling lonely. *Id.* at 146-47. She asserted that she did not handle stress well. *Id.* at 148. Merdan included several pages of additional comments reiterating her frustration about her physical limitations, fatigue, and inability to secure a job. *Id.* at 149-50.

On December 12, 2007, non-treating physician, Dr. Pat Chan, completed a Physical Residual Functional Capacity Assessment of Merdan and made no reference to depression or anxiety. *Id.* at 378-85. On February 28, 2008, Dr. Dar Muceno affirmed Dr. Chan's assessment. *Id.* at 453.

In a Social Security Administration Disability Report Appeal Form dated January 17, 2008 completed by B. Roux[5], Merdan stated with respect to changes in her illnesses, injuries, or conditions, "this stress is killing me." *Id.* at 177. Merdan also expressed frustration with feeling exhausted and struggling to take care of herself. *Id.* at 180.

In a Case Development Worksheet entry dated February 12, 2008, Michelle Leahy noted that Merdan did not make any mental health allegations but had a history of depression, which she was "doing well" in treating. *Id.* at 455. Leahy noted that the medical review of Merdan's mental condition did not reveal any abnormalities. *Id.*

On April 24, 2008, Dr. Vagneur treated Merdan at the Allina Health Clinic in Minneapolis, Minnesota for numerous physical conditions including diabetes and numbness in her extremities. *Id.* at 526-27. Vagneur listed "anxiety depression" in his assessment of Merdan but did not make any further references to her mental health. *Id.* at 527.

In a Medical Source Statement of Ability to Do Work-Related Activities (Physical) Form

---

[5] The record did not contain B. Roux's first name or title. *Id*. at 177.

dated June 30, 2008, Dr. David Vagneur did not list any mental impairments that would interfere with Merdan's work, physical activities, and coping skills.  *Id.* at 516-21.  Merdan's ability to understand, remember, and interact with co-workers were not affected by any mental impairments.  *Id.*  In a progress note for a visit on the same date, however, Dr. Vagneur included an anxiety disorder in his assessment of Merdan and noted that he and Merdan discussed her anxiety.  *Id.* at 525.

In an office visit on October 30, 2008, Merdan saw Dr. Vagneur.  *Id.* at 536-39.  Dr. Vagneur included "anxiety depression" in Merdan's active problem list.  *Id.* at 536.  He also included anxiety in Merdan's past medical history.  *Id.*  In his review of symptoms, Dr. Vagneur noted that Merdan displayed psychiatric anxiety, depression, and sadness.  *Id.* at 538.

On February 18, 2009, four weeks after Merdan's hearing before the ALJ, Dr. Vagneur completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form on Merdan's behalf.  *Id.* at 545-47.  Dr. Vagneur indicated that Merdan's ability to remember, understand, and carry out instructions and her ability to respond appropriately to supervision, co-workers, and pressures in a work setting were not affected by her any mental impairments.  *Id.* at 545-46.  Vagneur also stated that Merdan did not have any additional capabilities affected by her impairments and that she could manage benefits.  *Id.* at 546-47.

Dr. Elizabeth Z. Grey, a cardiologist at the Minneapolis Heart Institute, treated Merdan on May 19, 2009.  *Id.* at 553-58.  Dr. Grey listed anxiety and depression on Merdan's Active Problem List.  *Id.* at 554, 561.  In her progress notes, Dr. Grey recorded that Merdan denied having depression or anxiety.  *Id.* at 555, 562.  In a Minneapolis Heart Institute questionnaire dated May 11, 2009, Merdan checked and wrote "sometimes" next to the boxes for anxiety and depression.  *Id.* at 647.

On June 23, 2009, Merdan saw neurologist Dr. Praful Kelkar at the Noran Neurological Clinic in Fridley, Minnesota. *Id.* at 573-74, 628-31. The review of symptoms and past history sections of the patient form Merdan completed prior to seeing Dr. Kelkar reveal question marks next to the boxes for depression and anxiety. *Id.* at 573-74. In a letter to Merdan's primary care physician, Dr. Vagneur, Dr. Kelkar listed depression and anxiety in his physical review of Merdan. *Id.* at 629. Under the mental status section of Dr. Kelkar's neurological examination, he noted that Merdan's mood and affect were appropriate to the situation. *Id*. Dr. Kelkar stated that if a brain MRI to investigate Merdan's headaches and extremity numbness was unremarkable, then he suspected that these symptoms were "related to problems with anxiety." *Id.* at 630.

### D.  Vocational Expert Testimony

William E. Villa[6] testified as a vocational expert ("VE") at the hearing before the ALJ. *Id.* at 28-37. Villa described Merdan's impairments as type II diabetes mellitus without complications, obesity, hypertension without end organ damage, asthma, dizziness, physical impairments described in Dr. Vagneur's active problem lists for Merdan on November 3, 2008 and April 24, 2008 including "anxiety depression," fatigue, and esophageal reflux. *Id.* at 28, 527, 536. Villa determined that none of Merdan's impairments met Listing 9.08 for diabetes. *Id.* at 29. He described Merdan as able to perform light work, lifting less than ten pounds and standing or sitting six hours out of an eight hour work day. *Id.* at 29, 30. He did not identify any impairments that precluded climbing, balancing, stooping, kneeling, crouching, or crawling. *Id.* at 29. Villa did not find that Merdan had any manipulative limitations based on her

---

[6] The transcript of the ALJ hearing inaccurately refers to vocational expert Villa as "Dr. Biller." Based on Villa's professional qualifications, it does not appear that he has a medical degree or any other type of doctoral degree. Thus, the Court will refer to him as "Villa." *Id.* at 99.

musculoskeletal and neurological exams. *Id*. Villa would, however, limit Merdan's exposure to moderate levels of fumes, odors, dust, and gases because of her asthma. *Id*.

Dr. Vagneur assessed Merdan at an RFC between light and sedentary with sitting four hours per day and standing or walking four hours per day. *Id*. at 29. In contrast, Villa assessed Merdan at a light work RFC allowing the lifting of twenty pounds occasionally, ten pounds frequently, and standing or walking six hours out of an eight hour day. *Id*. Villa concurred with Dr. Vagneur's assessment of Merdan's RFC restricting Merdan from lifting over ten pounds based on Merdan's symptoms yet asserted that Dr. Vagneur did not give a diagnosis for his physical findings with respect to Merdan's impairments. *Id*. at 30-31. Villa did not identify any impairments requiring Merdan to change positions at her work station. *Id.* at 30.

The ALJ posed a hypothetical question to Villa about the work limitations of an individual with the following characteristics: 1) some education beyond high school; 2) work experience as Villa had previously outlined for Merdan; 3) impairments of diabetes, anxiety, asthma, and obesity; 4) limited to carrying ten pounds occasionally and five pounds frequently; 5) able to carry out all aspects of sedentary work; 6) capable of sitting, standing, or walking four hours each out of an eight hour work day; 7) limited to work with no heights, slats, scaffolding, dangerous or hazardous machinery, exposure to temperature, humidity extremes, or concentrated fumes, smoke, or airborne irritants; 8) limited to positions of an unskilled or semiskilled nature. *Id.* at 34-35.

Villa asserted that an individual described in the hypothetical could perform the following positions: 1) credit clerk (DOT 205.367-022) with at least 1600 positions in Minnesota; 2) credit authorizer (DOT 249.367-022) with approximately 2200 positions in Minnesota; and 3) charge card clerk (DOT 209.367-034) with slightly fewer than 1,000 jobs in

Minnesota.[7] *Id.* at 35.   All three of the positions Villa described involved computer and keyboarding capabilities and were in industries related to Merdan's past work.   *Id.* at 35-36. Based on Merdan's hearing testimony, Villa withdrew his assertion that Merdan could work as a waitress.  *Id.* at 34.

The ALJ then posed a second hypothetical for positions that an individual described in the first hypothetical would be capable of performing at the sedentary level if the individual: 1) was never able to finger, feel, push, or pull with the non-dominant arm; 2) could not climb, balance, stoop, crouch, or crawl; 3) could only occasionally climb steps or kneel; 4) could not read ordinary newsprint but could read a computer screen; 5) could never be at unprotected heights, move machinery, operate motor vehicles, or be in contact with humidity, wetness, dust, odors, fumes, extreme cold, heat, or vibrating equipment; and 6) required a quiet place to work such as a library.  *Id.* at 35-36.  In response to the ALJ's second hypothetical question, Villa agreed there would not be any jobs in the national or regional economy that such an individual could perform.  *Id.* at 36.

### E.  The ALJ's Decision

The ALJ issued an unfavorable decision on May 7, 2009.  *Id.* at 10-17.  In finding that Merdan was not disabled, the ALJ employed the required five-step evaluation considering: 1) whether Merdan was engaged in substantial gainful activity; 2) whether Merdan had severe impairments; 3) whether Merdan's impairments met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4) whether Merdan was capable of returning to past work; and 5) whether Merdan could do other work existing in significant numbers in the regional or

---

[7] Villa's Vocational Analysis identified four positions Merdan performed in her past: 1) Waitress (DOT Code 311.677.010 – light unskilled); 2) Bank Teller (DOT Code 211.312-018 – light skilled); 3) Loan Processor (DOT Code 205.367.022 – sedentary semiskilled); 4) Reservation Clerk (DOT Code 238.367-038 – light semiskilled).  *Id.* at 220.

national economy.  *See* 20 C.F.R. § 416.920(a)-(f).

At the first step of the evaluation, the ALJ found that Merdan had not engaged in substantial gainful activity since her alleged onset date of March 24, 2007.  *Id.* at 6.  At the second step, the ALJ found that Merdan had severe impairments including type II diabetes mellitus, obesity, hypertension, asthma, and depression NOS with anxiety (30 CFR 404.1520(c) and 416.920(c)).  *Id.*

At step three, the ALJ determined Merdan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525-1526, 416.925-926).  *Id.* at 6-7.  The ALJ found that Merdan's diabetes was fairly well-controlled, which led the ALJ to determine that Merdan's diabetes was not severe enough to meet the diabetes Listing impairment.  *Id.* at 7.

At step four of the evaluation, the ALJ was required to consider Merdan's subjective complaints under *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984) as well as objective medical evidence.  *Id.* at 7.  The ALJ summarized Merdan's testimony as demonstrating that she suffered from poorly controlled diabetes resulting in low energy and fatigue, as well as numbness and tingling in her left hand, hip, and neck, back and leg pain with numbness in her legs, difficulty breathing in cold temperatures, and frustration related to untreated depression and anxiety.  *Id.*  First, the ALJ found that though Merdan's medical impairments could be expected to cause her alleged symptoms, Merdan's statements regarding the persistence, intensity of the limiting effects were not credible to the extent that they were not consistent with a sedentary work RFC.  *Id.* at 8.  Second, the ALJ found that the asserted severity of Merdan's impairments was consistent with neither the objective medical evidence nor Merdan's course of treatment.  *Id.*

Specifically, the ALJ summarized the objective medical evidence regarding Merdan's

treatment with three doctors for her physical impairments between November 2006 and October 2008: Dr. John White, Dr. Danielle Busse-Quenan, and Dr. David Vagneur. *Id.* at 8-9. The ALJ also noted that in March 2007, Merdan stated that she was feeling "a little depressed but ok." *Id.* at 8. Based on the relevant medical records, the ALJ determined that Merdan's diabetes and other physical impairments, which did not warrant x-rays, were being managed conservatively and emphasized that Dr. Vagneur's treatment notes did not support the finding that Merdan's physical impairments were severe. *Id.* at 9. Moreover, the ALJ found that Merdan's diabetes was "uncomplicated and under fairly good control" with an acceptable hemoglobin level. *Id.*

The ALJ characterized Merdan's RFC as sedentary as defined in 20 CFR 404.1567(a) and 416.967(a) involving the lifting and carrying of ten pounds occasionally and five pounds frequently, standing or walking two hours of an eight hour day and sitting six hours of an eight hour day, and allowing for hourly changes of work station position. *Id.* at 7. Merdan's RFC restricted her from working at heights, climbing ladders and scaffolds, being near hazardous or dangerous machinery or equipment and required her to avoid exposure to extreme temperatures or humidity, smoke, or fumes. *Id.* The ALJ also noted that Merdan's RFC limited the use of her left hand, which prevented her from doing more than unskilled to semi-skilled work. *Id.*

Next, the ALJ considered the opinion evidence. *Id.* at 9. She placed significant weight on the non-treating medical expert's testimony and on the opinions of Merdan's treating physicians to the extent that objective medical evidence supported their opinions. *Id.* The ALJ also disagreed with the medical expert, Dr. Jared A. Frazin's assessment of a light work RFC for Merdan rather than a sedentary RFC because the ALJ gave Merdan "the benefit of all reasonable doubt" as to Merdan's impairments. *Id.*

Ultimately, the ALJ determined that Merdan's overall level of functioning was not

13

consistent with a finding of disability because Merdan lived independently, engaged in a wide range of household tasks, and was active with computer communications and piano practice two to three hours per day.  *Id.* at 9.  The ALJ also noted that Merdan used public transportation without problems and visited with family.  *Id.*

With respect to Merdan's depression and anxiety, the ALJ noted that Merdan requested a psychological consultative examination at the hearing.  *Id.* at 9.[8]  The ALJ's written decision explained that she included depression and anxiety in Merdan's list of impairments "despite the lack of treatment associated with [Merdan's] complaints."  *Id.*  The ALJ, however, denied Merdan's request for a psychological examination "due to the lack of support suggesting severe mental limitations."  *Id.*

At step five, the ALJ determined that Merdan was capable of performing past work as a credit clerk, which did not require the performance of work-related activities that Merdan's sedentary RFC precluded.  *Id.* at 9-10.  The ALJ based her determination on the testimony of the VE, William Villa, who answered two hypothetical questions regarding the jobs that an individual with Merdan's impairments would be able to perform in the national economy.  *Id.* at 10.  The ALJ also noted that she questioned Villa regarding the consistency of his opinion with the Dictionary of Occupational Titles (DOT).  Accordingly, the ALJ concluded that Merdan was not disabled from March 24, 2007 (alleged onset of Merdan's disability) to May 7, 2009 (date of ALJ's written decision) as defined in 20 C.F.R. 404.1520(f) and 416.920(f).  *Id.*

---

[8] At the hearing, Merdan's counsel requested that if the ALJ did not find enough evidence as to Merdan's anxiety and depression that the ALJ schedule a consultative examination.  *Id.* at 17. The ALJ stated that she would take the request under advisement.  *Id.*

### F.   Post-Hearing Mental Health Evaluation

Merdan's counsel submitted a two-page "brief" dated November 30, 2009, to the Appeals Council in support of Merdan's claim.  *Id.* at 259-60.  The brief summarized the ALJ's basis for declining to order a psychological evaluation and reported that Merdan underwent a consultative psychological evaluation "[i]n the context of filing a new claim."  *Id.* at 259.  In a report dated November 4, 2009, Dr. Karayusuf diagnosed Merdan with a generalized anxiety disorder, an adjustment disorder with depressed mood.  *Id*.  Merdan's counsel asserted that Karayusuf's diagnosis of anxiety and depression rendered her disabled.  *Id.* at 260.  The letter further contended that the ALJ's failure to develop the record regarding Merdan's anxiety and depressions was "arguably reversible error" and that "the results of [Dr. Karayusuf's] exam confirm the claimant would have limitations due to her psychological impairments."  *Id*.  Accordingly, Merdan requested that the Appeals Counsel make a finding that she was disabled. *Id*.

Dr. Karayusuf's November 4, 2009 report was not included in the administrative record. The letter, however, was attached as Exhibit A to the Commissioner's Memorandum.  The Appeals Council's denial made no reference to Karayusuf's report and there is no evidence that the Council considered the report's effect on the disability determination the ALJ rendered on May 7, 2009.  *Id.* at 650-53.  The Appeals Council did, however, list consideration of the aforementioned brief that stated that Dr. Karayusuf's report was attached.[9]  *Id.* at 259, 650-53. Significantly, the Appeals Council's denial did not include Karayusuf's report in the three sets of

---

[9] The parties and the record are unclear as to whether or when this additional report was submitted to the Appeals Council.  Neither party has knowledge as to whether the Commissioner received the report or whether the report was received and subsequently misplaced or lost. (Def.'s Mem. at 11, n.2; Pl.'s Mem. at 9, n.1).  Dr. Karayusuf November 9, 2009 report was not included in the Administrative Record, yet it was attached to the Commissioner's Memorandum.  (Def.'s Ex. A).

evidence that were added to the record after the hearing before the ALJ.  *Id.* at 259-93, 548-649, 653.

When Dr. Karayusuf examined Merdan on October 31, 2009, her chief complaints were extreme fatigue, anxiety, and frustration with her medical and financial conditions.  (Def's Ex. A, at 1) [Doc. No. 14].  Dr. Karayusuf reported that Merdan had never received psychiatric care, taken psychotropic medications, or demonstrated a history of drug use or suicidal thoughts.  *Id.* He described Merdan as a life-long anxious individual currently struggling with sadness and disappointment as a result of her health issues and difficulty finding work.  *Id.*  Dr. Karayusuf noted that Merdan occasionally broke into tears, felt uncertain about her future, and exhibited diminished self-esteem.  *Id.*  Merdan did not report any changes in appetite or difficulty sleeping or concentrating.  *Id.*

Dr. Karayusuf described Merdan's daily routine in detail including her ability to care for her daily needs and hygiene, complete household tasks regularly, and get around by receiving rides from others.  *Id.* Merdan had sufficient concentration to play piano for one hour approximately three times per week, watch television for five to six hours per day and have regular phone conversations with her sister, children, mother, and other family members.  *Id.* at 1-2.  Merdan was not taking any medications for her alleged depression or anxiety when Dr. Karayusuf examined her.  *Id.* at 2.

Dr. Karayusuf described Merdan's mental status as being orientated to time, place, and person.  *Id.* at 2.  Merdan's digit recall was good and her remote and recent memory were intact. *Id*.  Karayusuf opined that Merdan was of average intelligence and had "fair" insight.  *Id*. Merdan related in an anxious, subdued, and friendly manner with good eye contact.  *Id.*  She was not restless and did not show any signs of psychomotor retardation or agitation, though she

appeared "mildly depressed." *Id.* Merdan's speech was coherent and relevant. *Id.*

Karayusuf diagnosed Merdan with a generalized anxiety disorder and an adjustment disorder with depressed mood. *Id.* at 2. He described Merdan's anxiety as "chronic." *Id.* Dr. Karayusuf opined that Merdan's depression was "a new problem related to the stresses of her physical health and her diminished physical capabilities." *Id.* Karayusuf did not have any medical records for his review and gave Merdan an "uncertain" prognosis. *Id.* He concluded that Merdan was able to follow, understand, and retain simple instructions, interact appropriately with co-workers, supervisors, and the public, and maintain pace and persistence when performing repetitive tasks. *Id.* Merdan was capable of managing benefits. *Id.*

## A. Correspondence from Claimant

Between October 21, 2007 and March 27, 2010, Merdan submitted over 40 letters to the Social Security Administration, counsel, and various medical providers that are included in the Administrative Record. *Id.* at 51-56, 66-67, 183-186, 189, 204-14, 222-27, 229-30, 232-27, 239-41, 243-44, 246-48, 250-52, 255-58, 262-63, 266-67, 269-72, 274-79, 281-82, 284-86, 288-90, 292-94, 435-38, 444-45, 514-15. Nearly all of the letters, most of which were addressed "To Whom It May Concern," expressed Merdan's feelings of frustration and desperation as a result of her medical conditions, financial concerns, and disability application process. *Id.* Twelve of Merdan's letters mentioned anxiety or depression explicitly, which the Court summarizes below as they relate to her alleged anxiety and depression. *Id.* at 222-27, 229-30, 255-58, 263, 266-67, 269-72, 289-90, 294, 360-62, 435-38, 444-45, 514-15.

On October 21, 2007, Merdan wrote to Dr. John C. White requesting a medical examination in conjunction with her social security application. *Id.* at 360-62, 444-45, 514-15. Merdan described experiencing extreme fatigue, loneliness, and a lack of self-confidence. *Id.* at

361-62, 444-45.  She also listed "depressed" as a "diagnosis so far," though Merdan stated that she had not taken any medications for her depression.  *Id.* at 361, 444, 514.

In a letter dated January 4, 2008 to Dr. Busse-Quenan, Merdan described her extreme anxiety in not being able to cope with her diabetes and frustration with her physical limitations and their effect on her ability to obtain a job.  *Id.* at 435-38, 475-77.  She expressed feeling helpless and unable to handle the stress of her physical impairments.  *Id.* at 438, 477.

On January 23, 2009, Merdan wrote a letter to an unnamed sender regarding her depression.  *Id.* at 222-227.  She described feeling depressed as a result of being unable to find a job, experiencing fatigue as a result of her diabetes, trips to the hospital, financial, medical  and transportation difficulties, selling her home, taking an "overwhelming" number of medications. *Id.*  Merdan also expressed fear and anxiety that she would soon become homeless.  *Id.* at 227.

In a letter to her attorneys dated March 25, 2008,[10] regarding her efforts to obtain a depression diagnosis,[11] Merdan stated that a doctor she saw in August 2008.  *Id*. at 299.  Merdan stated that she was diagnosed as "moderately depressed" and that the unnamed doctor she saw suggested that she see a therapist.  *Id.* at 229.  Merdan reported that she was "mildly depressed" according to paperwork dated February 2, 2009.  *Id*.  The doctor that treated Merdan in February 2009 did not prescribe medication for her depression because, according to Merdan, the doctor felt that a prescription was unnecessary.  *Id*.  Merdan also recounted arguing with her diabetic educator, Pat Kowalski, about "the 'depression' issue."  *Id.* at 230.

In a letter dated May 20, 2009, Merdan wrote a two-page letter chronicling her recent

---

[10] Given that the letter is dated March, 25, 2008, and the events described in the letter occurred in August 2008 and February 2009 and the fact that the correspondence cover sheet is dated 2009, the Court presumes that the correct date of the letter is March 25, 2009 rather.  *Id.* at 228-229.
[11] Merdan's Counsel also submitted another letter dated May 20, 2009 from Merdan to themselves and to the Appeals Council for inclusion in the administrative record.  *Id.* at 288.

treatment with cardiologist Dr. Tara Michaels. *Id.* at 289-90. Merdan asserted, "[b]eing tired is not ALWAYS about "DEPRESSION" [t]here just may be something physically wrong." (emphasis in original). *Id.* at 289. Merdan also reported feeling over-medicated and feeling helpless in combating her daily fatigue. *Id.*

In a letter dated August 24, 2009, Merdan stated that the Noran Neurological Clinic stated that she had anxiety issues "and, perhaps, depression." *Id.* at 263. She reported that the treatment she received at the Noran Clinic was helping to alleviate her anxiety. *Id.*

In a letter dated October 5, 2009, Merdan wrote, "Hopefully my disability will come without the depression evaluation." *Id.* at 270. In a letter dated October 11, 2009, Merdan made reference to feeling depressed and experiencing anxiety because she did not have adequate financial resources to pay her medical bills and living expenses. *Id.* at 271. She also described her life as "out of control." *Id.*

In a letter dated October 22, 2009, Merdan described a "downward spiral" in her life that created a "depression of circumstances." *Id.* at 266. Merdan denied having suicidal thoughts. *Id.* She asserted that her disability and stress regarding her life situation "has created the anxiety I am experiencing to date." *Id.* Merdan also wrote that if she did not have such heavy financial burdens, then some of her anxiety would be relieved. *Id.* at 267.

In a letter dated December 22, 2009, Merdan described her anxiety as a result of her health struggles with diabetes, lung tests, and heart diagnostic tests. *Id.* at 257. She described feeling extremely fatigued and frustrated. *Id.* Merdan described her feelings of "lifelessness, pain, agony, breathlessness, [and] fatigue" as "on-going." *Id.* at 258.

In a letter dated January 5, 2010, Merdan reported requesting depression medication from her doctor. *Id.* at 255. She reported not seeing any immediate effects of taking Citalopram for

her depression and reiterated her feelings of frustration and helplessness.  *Id*.  She stated that she was taking Citalopram for her depression so that she could make it through each day.  *Id*.

In a letter dated March 27, 2010, Merdan reported easing off Citalopram as a result of dizzy spells.  *Id*. at 294.  She asserted that she was feeling "ok" while taking Citalopram.  *Id*. She was able to successfully go out with family without becoming panicked or dizzy.  *Id*. Merdan suspected that her propensity for feeling dizzy explained why she had been prescribed a 10 milligram dose of Citalopram rather than a 20 milligram dose.  *Id*.

## II.     STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(2)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy."  *Id*.

### A.  Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929, 416.1429.  If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic.  20 C.F.R. §§ 404.967-.982, 416.1467.  If

the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court. An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

### B.   Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)). A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors:  1) the ALJ's findings regarding credibility; 2) the claimant's education, background, work history and age; 3) the medical evidence provided by the claimant's treating and consulting physicians; 4) the claimant's subjective complaints of pain and description of physical activity and impairment; 5) third parties' corroboration of the claimant's physical impairment; and 6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments.  *Brand v. Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).  Proof of disability is the claimant's burden.  20 C.F.R. § 404.1512(a).  Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion."  *Hensley*, 352 F.3d at 355.  If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently."  *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

### A.  Whether the ALJ Adequately Developed the Record

Merdan argues that the Commissioner failed to adequately develop the administrative

record because the ALJ did not order a mental health evaluation.  Merdan further asserts that the explanation the ALJ gave for declining to order a mental health evaluation was inadequate.  For these reasons, Merdan requests that the Court reverse and grant benefits or remand the case for further proceedings.

The ALJ bears a "responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (internal citation omitted); *see Coleman v. Astrue*, 498 F.3d 767, 771 (8th Cir. 2007) (quoting *Snead*, 360 F.3d at 838-39).  Unless a critical issue is undeveloped, the ALJ is not required to obtain additional or clarifying statements.  *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005); *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  Generally, the claimant's failure to provide information as to Step Four, where the claimant bears the burden of proof, "should not be held against the ALJ when there **is** evidence that supports the ALJ's decision." *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (emphasis in original).  Put another way, "'an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" *Warburton v. Apfel*, 188 F.3d 1047, 1051 (8th Cir. 1999) (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)); *See Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994).

### 1.  Whether Merdan Suffered from Depression and Anxiety

To establish reversible error, Merdan must also show that the alleged failure to develop the record was prejudicial.  *See Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001) (holding ALJ was not required to order a consultative examination where medical evidence addressed the impairments, substantial evidence supported the ALJ's decision, and the plaintiff made no showing of prejudice).  A consultative exam is a "physical or mental examination or

test purchased for [the claimant] at [the SSA's] request and expense from a treating source or another medical source."   20 C.F.R. § 404.1519.   The Commissioner is required to order a consultative exam in the following instances:

> (1) The additional evidence needed is not contained in the records of [the claimant's] medical sources;
> (2) The evidence that may have been available from [the claimant's] treating or other medical sources cannot be obtained for reasons beyond [the claimant's] control, such as death or noncooperation of a medical source;
> (3) Highly technical or specialized medical evidence that we need is not available from [the claimant's] treating or other medical sources;
> (4) A conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, and we are unable to do so by recontacting [the claimant's] medical source; or
> (5) There is an indication of a change in [the claimant's] condition that is likely to affect [the claimant's] ability to work, but the current severity of [the claimant's] impairment is not established.

20 C.F.R. § 404.1519a (b)(1-5).

In evaluating prejudice to a claimant, the Court is faced with the "peculiar task" of speculating as to "how the administrative judge would have weighed the newly submitted reports if they had been available for the original hearing."  *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).  In *Bauer v. Soc. Sec. Admin.*, 2010 WL 3385203, Civ. No. 08-6088, at *31 (RHK/RLE) (D. Minn. Jul. 26, 2010), plaintiff alleged that the ALJ failed to adequately develop the record because the SSA purportedly lost records and the ALJ impermissibly came to her own medical conclusions rather than obtaining a consultative medical examination.  In affirming the ALJ's denial of benefits, Magistrate Judge Raymond L. Erickson emphasized that "the ALJ accounted for the Plaintiff's diagnoses of depression and ADHD in her formulation of the RFC" based on references to these conditions in the record.  *Id*. at *31, n.38.  Magistrate Judge Erickson found that the ALJ "generously afforded the Plaintiff the benefit of the doubt" as to her impairments "[d]espite the lack of treatment during the relevant time period."  *Id*. at *35.  The ALJ in *Bauer* adequately developed the record because an ALJ is not required to develop records on claims

that are "otherwise apparent." *Id*. at *35, n.39 (citing *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003)).

Here, as in *Bauer*, the ALJ gave the claimant the benefit of the doubt as to whether the claimant suffered from severe mental impairments. *See* 2010 WL 3385203, at *35; Admin. R. at 6, 9. Despite the absence of conclusive depression and anxiety diagnoses, the ALJ found these conditions to be severe impairments. Admin. R. at 6. Nevertheless, the ALJ found that despite Merdan's depression, anxiety and physical impairments, she was capable of performing a sedentary RFC. *Id*. at 10.

The Court's review of the evidence in the administrative record reveals several doctors' references to Merdan's depression and anxiety that support the ALJ's determination that Merdan suffered from depression and anxiety.[12] On March 22, 2007, Dr. Busse-Quenan described Merdan as "a little depressed but okay." *Id*. at 299, 414. Similarly, On April 24, 2008, June 30, 2008, and October 30, 2008, Merdan's treating primary physician, Dr. Vagneur, made passing references to Merdan's depression or anxiety. *Id*. at 525-27, 536. Merdan's cardiologist, Dr. Grey, listed anxiety and depression in Merdan's active problem list on May 19, 2009, though Merdan denied that she suffered from either condition. *Id*. at 554-55, 561-62.

Additionally, written correspondence in the administrative record supports the ALJ's determination that Merdan suffered from depression and anxiety. Disability Examiners Collins and Leahy included depression in Merdan's impairments on nearly a dozen occasions. *Id*. at 315, 322, 326, 330, 371-72, 393-94, 440-41. In a December 4, 2007 case development entry, Collins made reference to Merdan cancelling an appointment for a mental health evaluation. *Id*.

---

[12] In her Memorandum, Merdan overstates the medical evidence when she asserts: "[t]he medical record is also significant for a history of mental impairments. Merdan has been diagnosed with anxiety disorder and depression. Tr. 525, 527, 536." (Pl.'s Mem. at 6).

at 390.  Also, Merdan discussed her depression and anxiety in twelve of the 40 letters she wrote

between 2007 and 2010, though in several instances she maintained that she was not depressed.

*Id*. at 222-27, 229-30, 255-58, 263, 266-67, 269-72, 289-90, 294, 360-62, 435-38, 444-45, 514-

15.  Similarly, in various health questionnaires and SSA disability reports, Merdan repeatedly

referenced her depression and anxiety.  *Id*. at 142-50, 177, 386-91, 573-74, 647.  Merdan has not

shown prejudice as a result of the ALJ's determination that anxiety and depression are among

her severe impairments.  *See Haley*, 258 F.3d at 749-50.

### 2.  Whether Merdan's Depression Affected Her RFC

In her Reply Memorandum, Merdan asserts that the ALJ's decision was not supported by

substantial evidence on the record as a whole because the ALJ did not order a consultative

mental health evaluation to assess the severity of Merdan's depression and anxiety.  (Pl.'s Reply

Mem. at 3) [Doc. No. 17].  In determining whether a claimant's mental impairments are

"severe," 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3) require the ALJ to consider the

following "broad functional" areas: 1) ability to perform "activities of daily living;" 2) the

claimant's "social functioning;" 3) pace, concentration, and persistence; and 4) "episodes of

decompensation."  If the ALJ finds no limitations or merely mild limitations with respect to the

first three functional areas, the ALJ will generally conclude that an impairment is not severe

"unless the evidence otherwise indicates that there is more than a minimal limitation in [the

claimant's] ability to do basic work activities."  *Id*. §§ 404.1520a(d)(1), 416.920a(d)(1).

The ALJ's reason for not ordering a consultative evaluation is circular: Merdan's

depression and anxiety were not severe enough to warrant a SSA-ordered mental health

evaluation.  Admin. R. at 9.  Despite the ALJ's assertion that Merdan's depression and anxiety

were not severe, she included depression and anxiety as "severe impairments" and made a

cursory attempt to assess the effect of these impairments on Merdan's RFC.  *Id.* at 6, 9.

Presumably, based on the small number of references in record, the ALJ determined that Merdan

was able to perform household tasks, live independently, visit with family, and utilize public

transportation without difficulty despite her physical and mental impairments.  Admin. R. at 9.

The ALJ found substantial evidence on the record as a whole to determine that Merdan suffered

from depression, yet the record is significantly lacking in any evidence as to the effect of

Merdan's depression and anxiety on her RFC in light of her social and daily functioning

capacities as well as her concentration, pace, and persistence as required by §§ 404.1520a(d)(1),

416.920a(d)(1).  *See Buckner v. Astrue*, 10-cv-1524 (8th Cir. Jul. 19, 2011).  The ALJ's error in

this respect was prejudicial to Merdan given that her application for benefits was denied in the

instant case and granted at the initial stage of a subsequent application, which included mental

health evaluation.[13]  *See Haley*, 258 F.3d at 749-50.

Additionally, with respect to the ALJ's determination as to the severity of Merdan's

mental health impairments, this case is distinguishable from *Bauer* in applying the available

mental health evidence to assess the claimant's RFC.  In *Bauer*, several mental health

evaluations provided the ALJ with sufficient evidence from which to evaluate the severity of the

claimant's mental impairments.  Here, in contrast, no mental health consultative evaluation was

performed, despite the fact that 20 C.F.R. § 404.1519a (b)(5) requires an ALJ to order a

consultative evaluation when there was not sufficient evidence in the record as to the severity of

a claimant's mental impairments.  The sporadic, superficial, vague references to Merdan's

depression did not provide an adequate basis from which the ALJ could determine the severity of

---

[13] Though Merdan's Memorandum states that Merdan's subsequent disability claim was
approved at the initial level and included Dr. Karayusuf's consultative mental health evaluation,
the Court was not provided with any information as to whether Merdan alleged additional
impairments or a different onset date in that application.  (Pl's Mem. at 9, n.1).

Merdan's depression. Accordingly, the ALJ's determination as to the severity of Merdan's depression and its effect on Merdan's RFC lacks substantial evidence on the record as a whole, causing prejudice to Merdan. Accordingly, remand is appropriate to allow for a full development of the record.

### 3. Dr. Karayusuf's Mental Health Evaluation

Merdan argues that the Appeals Council erred in not reversing the ALJ's denial of benefits in light of Dr. Karayusuf's report diagnosing Merdan with depression and anxiety. Merdan asserts that the Appeals Council's failure to consider Dr. Karayusuf's report and include the report in the administrative record was prejudicial error. Merdan, therefore, moves for reversal and, in the alternative, remand for failure to develop the record.

A court may remand a social security claim for consideration of additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Hepp v. Astrue*, 511 F.3d 798, 808 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)). "To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination." *Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993). "Good cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing a sufficient explanation." *Hepp*, 511 F.3d at 808 (citing *Hinchey v. Shalala*, 29 F.3d 428, 433 (8th Cir. 1994)). Though the Appeals Council may not have considered certain evidence, a district court must nevertheless consider that evidence. *See Moriarity v. Astrue*, 2009 WL 1313322, at

*3 (D. Iowa May 13, 2009) (citing *Riley*, 18 F.3d at 622, *Flynn v. Chater*, 107 F.3d 617, 621-22 (8th Cir. 1997)).

In *Hinchey v. Shalala*, 29 F.3d 428, 433 (8th Cir. 1994), the ALJ held the administrative record open to allow plaintiff to submit additional medical records and to allow a treating physician to clarify several statements.  In affirming the District Court's determination that plaintiff had not satisfied the good cause requirement, the Eighth Circuit held that when a party fails to submit additional evidence during the time period during which the record was held open, the Court "need not determine whether the evidence was material."  *Hinchey*, 29 F.3d at 433. Similarly, in *Hepp v. Astrue*, 511 F.3d 798, 808 (8th Cir. 2008), the Eighth Circuit relied on *Hinchey* to hold that the District Court was justified in declining to evaluate the materiality of new evidence that was submitted after the hearing because plaintiff failed to explain why the information was not obtained prior to the closing of the administrative record.  The Eighth Circuit further held that because the report in question was issued four years after plaintiff's last date of coverage, the report was "not relevant to [plaintiff's] condition during the period which benefits were denied." *Id*. at 808.

Here, at Merdan's request, the ALJ held the record open for an additional twenty days to allow Merdan to conduct a mental health evaluation by February 11, 2009.  Admin. R. at 37. Merdan failed to submit any records during the requested twenty day period after the hearing. *Id*. at 259-60.  Rather, nearly nine months after the record closed and over five months after the ALJ issued her decision, Merdan submitted a two-page brief along with a two-page mental health evaluation from Dr. Karayusuf, who saw her for the first time and did not review her medical records.  *Id*.  Merdan's brief cited Dr. Karayusuf's report and did not explain why the mental health evaluation was not completed within twenty days after the administrative record

29

closed or in the ensuing eight months. *Id.* Instead, Merdan vaguely stated that Dr. Karayusuf's evaluation was conducted "[i]n the context of filing of a new claim" and that Merdan was "able to attend a consultative examination with SSA in connection with her new claim." *Id.* at 259-260. Nevertheless, Merdan did not articulate good cause pursuant to 42 U.S.C. § 405(g) regarding the nine month delay. *Id.*; *see Hepp*, 511 F.3d at 808.

Both parties focused their arguments on two key facts that the Court finds unavailing. First, it appears that due to an administrative error, which the Court does not attribute to either party, the Appeals Council did not consider Dr. Karayusuf's report in declining to review Merdan's denial. Because Merdan failed to establish good cause, and based on *Hinchey* and *Hepp*, the Court need not determine the materiality of Dr. Karayusuf's report. *See* 511 F.3d at 808; 29 F.3d at 433.

Second, Dr. Karayusuf's report describes Merdan's depression as a "new condition related to the stresses of her physical health and her diminished physical capabilities." [14] (Def.'s Ex. A at 2). Given that Dr. Karayusuf had not previously treated or evaluated Merdan, he was not in a position to determine whether her depression was a recent development. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996). Moreover, Karayusuf did not have the opportunity to review Merdan's medical history, which did not provide him with an adequate basis from which to conclude that Merdan's depression was a "new condition." (Def.'s Ex. A at 2). See *Kirby*, 500 F.3d at 709; *Piepgras*, 76 F.3d at 236. Additionally, the ALJ determined that depression and anxiety were among Merdan's severe

---

[14] The Commissioner asserts that the phrase "new condition" establishes that Merdan was not suffering from depression prior to October 2009. (Def.'s Mem. at 12-13). In contrast, Merdan asks the Court to infer based on the second clause of the sentence, "related to the stresses of her physical health and her diminished physical capabilities," that Merdan's depression started with Merdan's struggles several years prior. (Pl.'s Reply. Mem. at 4-5). Neither party's argument is persuasive.

impairments ten months before Dr. Karayusuf's evaluation.   Admin. R. at 6, 9.   Based on a careful review of the administrative record relevant to Merdan's depression and anxiety, the Court finds that the Appeals Council's decision to deny review are supported by substantial evidence on the record as a whole.   *See*, *e.g.*, *Warburton*, 188 F.3d at 1051; *Naber*, 22 F.3d at 189; *Barrett*, 38 F.3d at 1023.

## IV.    RECOMMENDATON

Based on all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.   Plaintiff Merdan's Motion for Summary Judgment [Doc. No. 9] be **GRANTED in part** and **DENIED in part**; and

2.   The case be **REMANDED to the Commissioner** for development of the Administrative Record consistent with this Report and Recommendation; and

3.   Defendant Commissioner Astrue's Motion for Summary Judgment [Doc. No. 12] be **DENIED**.

Dated: July 22, 2011

s/ Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 5, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.